S C GRAY, INCORPORATED v FORD MOTOR COMPANY

Docket Nos. 77-648, 77-649. Submitted May 3, 1979, at Detroit.— Decided October 15, 1979. Leave to appeal applied for.

S. C. Gray, Incorporated, brought an action against Ford Motor

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 62, 66.
   67 Am Jur 2d, Sales § 93.
[2] 17 Am Jur 2d, Contracts §§ 82, 344.
   67 Am Jur 2d, Sales §§ 106, 183.
   Construction and application of UCC § 2-305 open price term contracts. 91 ALR3d 1237.
[3, 5] 22 Am Jur 2d, Damages §§ 22-25, 296.
[4] 46 Am Jur 2d, Judgments § 127.
[5] 1 Am Jur 2d, Actions §§ 80, 81.
   67 Am Jur 2d, Sales §§ 728, 730.
   Form and substance of notice which buyer of goods must give in order to recover damages for seller's breach of warranty. 53 ALR2d 270.
[6] 47 Am Jur 2d, Jury § 3.
   75 Am Jur 2d, Trial §§ 321, 322.
[7] 31 Am Jur 2d, Expert and Opinion Evidence §§ 25-27, 29-32.
[8, 13] 67 Am Jur 2d, Sales § 739.
   Construction and effect of UCC Art 2 dealing with sales. 17 ALR3d 1010.
[9] 17 Am Jur 2d, Contracts § 293.
   67 Am Jur 2d, Sales §§ 460, 461.
[10] 30 Am Jur 2d, Evidence §§ 927, 928, 933.
   Letters to or from customers or suppliers as business records under statutes authorizing reception of business records in evidence. 68 ALR3d 1069.
[11] 75 Am Jur 2d, Trial § 771.
[12] 67 Am Jur 2d, Sales § 432.
   75 Am Jur 2d, Trial §§ 646, 651, 693.
[14] 29 Am Jur 2d, Evidence § 258.
   30 Am Jur 2d, Evidence §§ 1092, 1093.
[15] 46 Am Jur 2d, Judges § 219.
[16, 17] 67 Am Jur 2d, Sales §§ 559, 560, 622, 623.
[17, 18] 67 Am Jur 2d, Sales § 694, et seq.
[19] 17 Am Jur 2d, Contracts § 240 et seq.
[20, 21] 76 Am Jur 2d, Sales § 391.

Company, in Wayne Circuit Court, alleging that Ford had breached two separate and unrelated contracts. In count one Gray sought to recover for work done pursuant to oral modifications of a contract involving the manufacture of a machine which assembled and tested automobile transmission pumps. In count two Gray sought to recover the contract price for converting certain manually operated test stands to automatic operation.

The complaint was subsequently amended and a third count was added. Count three alleged that, as a result of Ford's failure to pay the amounts requested in counts one and two, Gray was forced to borrow money at high interest rates to carry on its business. Gray sought to recover the interest expense.

Ford Motor Company brought a counterclaim for breach of contract and breach of warranty in connection with the transmission pump machine.

Count one and Ford's counterclaim were tried together. The jury returned a verdict of $157,770 in favor of Gray on count one and of no cause of action on Ford's counterclaim. The trial court, Thomas J. Foley, J., subsequently granted Ford's motion for judgment notwithstanding the verdict and granted conditional new trials on both count one and the counterclaim. The trial court also granted Ford a new trial to determine damages on its counterclaim. Finally, the trial court granted Ford's motion for partial summary judgment on count three for failure to state a claim upon which relief could be granted.

A subsequent trial was held before Roman S. Gribbs, J., to determine the amount of damages due to Ford on its counterclaim. A judgment was entered awarding damages to Ford.

In a separate trial on count two, the jury returned a verdict in favor of plaintiff. Ford's motion for a judgment notwithstanding the verdict was denied, as was a subsequent motion for a new trial, Thomas E. Roumell, J.

Gray appeals from the judgments on counts one and three and Ford's counterclaim. Ford appeals from the judgment on count two. Numerous issues are raised on appeal. *Held:*

1. Assuming that the trier of fact did believe testimony that Gray objected to the terms and conditions contained on Ford's purchase order, which included a provision that all modifications of the contract were to be in writing, the terms and conditions did not become part of the contract and Gray was not precluded from showing oral modifications to the contract. The modifications did not have to be in writing to satisfy the

statute of frauds since the machine was to be specially manu-factured for the buyer and was not suitable for sale in the ordinary course of business.

2. The price for the changes for which the plaintiff sought the extra compensation was to be the number of hours multiplied by the plaintiff's hourly rate for performing such work. How-ever, the plaintiff introduced evidence only as to the reasonable value of the changes. Since the price term was fixed, the reasonable value is not the proper measure of damages. It was incumbent upon the plaintiff to prove damages by means of the agreed-to formula. The trial court did not err in granting judgment notwithstanding the verdict as to count one.

3. The trial court did not err in ruling, as to Ford's counter-claim, that no question of fact was presented concerning the failure of the machine to operate properly. From the evidence presented, reasonable minds could not have differed in conclud-ing that the machine as delivered by the plaintiff did not perform as required.

4. Under the Uniform Commercial Code a buyer must notify the seller of a breach or be barred from any remedy. The jury was not required to believe testimony that the plaintiff had been given timely notice by the buyer. The trial court erred in granting judgment notwithstanding the verdict to Ford on Ford's counterclaim.

5. At the trial before Judge Gribbs on the issue of Ford's damages, it was not improper to allow one of Ford's witnesses to testify as to the scrap value of test stands and the preheat tank. The trial court did not abuse its discretion in allowing the witness to testify as to these matters based upon his background, experience and familiarity with the equipment.

6. The only evidence upon which to base the amount of damages awarded to Ford on its counterclaim was testimony as to the price, the fact that the equipment was never used for production and the scrap value. The normal measure of dam-ages for breach of warranty is the difference between the value of the equipment at the time and place of acceptance and what its value would have been if it had been as warranted. The evidence of only the purchase price and salvage value was inadequate to support the award for breach of warranty.

7. Where the writings of the parties conflict as to warranties, neither provision becomes a part of the contract and the implied warranty provisions of the Uniform Commercial Code are in effect. In the case at bar, the warranty provisions of Gray and Ford did conflict, thus, the implied warranty provi-

sions of the UCC control. The new trial should be based upon implied warranties.

8. Certain exhibits consisting of purchase notifications to various suppliers were properly admitted into evidence under the business entry exception to the hearsay rule. A sufficient foundation for the admission of the records was established.

9. The plaintiff's request for an "adverse inference" instruction to the jury, based on the defendant's failure to call one of its employees as a witness, was properly denied since the witness in question, while an employee of the defendant, was within the jurisdiction and was available to the plaintiff by way of subpoena.

10. The trial court's instruction to the jury that acceptance of delivery and payment for the machine did not waive or bar damages for breach of contract or breach of warranty was a correct statement of the applicable law and was relevant since the question of acceptance was brought up at trial.

11. The trial court's instruction to the jury that the buyer is entitled to recover as damages the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable should not be used at the new trial. The proper instruction to give is that the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted.

12. An instruction to the jury that if a negative response is given to a question the question is meaningless and should be disregarded was erroneous and should not be repeated at the new trial.

13. Gray's claim that Judge Gribbs evidenced bias, thereby depriving Gray of a fair trial, is not supported by the record.

14. The damages claimed by plaintiff in count three, the interest expense on money it had to borrow to cover operating costs, were foreseeable and, therefore, fall into the category of consequential damages rather than incidental damages. The UCC does not allow a seller to recover consequential damages. The trial court was correct in granting Ford's motion for summary judgment as to count three based on plaintiff's failure to state a claim upon which relief could be granted.

15. In respect to count two, the trial court properly ruled that the contract involved was ambiguous. The trial court did not err in submitting to the jury the question of the interpretation of the contract.

16. The trial court should not have submitted to the jury the

question of whether Ford gave timely notice of its intent to cancel the contract. It is undisputed that oral notice was given on the date of inspection and that written notice followed six days later. As a matter of law, notice of rejection was given within a reasonable time.

17. Plaintiff's contention that Ford was required to give notice of intent to cancel for late delivery is unfounded in light of testimony by Richard Gray, vice-president of S. C. Gray, Inc., that the reason for the rejection was the failure of the machine to test accurately at 70 parts per hour.

The judgments on counts one and three are affirmed. The judgments on count two and the counterclaim are reversed and remanded for new trials.

1. CONTRACTS — ADDITIONAL TERMS IN ACCEPTANCE — MERCHANTS — NOTIFICATION OF OBJECTION — STATUTES.

Additional terms contained in an acceptance of a contract are to be construed as proposals for additions to the contract; as between merchants, they become part of the contract unless notification of objection to them has already been given or is given within a reasonable time after notice of them is received (MCL 440.2207; MSA 19.2207).

2. CONTRACTS — OPEN PRICE TERM — REASONABLE PRICE — STATUTES.

The price will be a reasonable price where the parties to a contract have intended to make a contract but have left the price term open (MCL 440.2305; MSA 19.2305).

3. DAMAGES — BURDEN OF PROOF.

A party asserting a claim has the burden of proving his damages with reasonable certainty.

4. JUDGMENTS — JUDGMENT NOTWITHSTANDING THE VERDICT — STANDARD.

The standard, in ruling on a motion for a judgment notwithstanding the verdict, is whether, after reviewing the facts and all legitimate inferences therefrom in the light most favorable to the party opposing the motion, reasonable men could differ; if they can, the question is one for the jury.

5. SALES — BREACH OF CONTRACT — NOTICE OF BREACH — UNIFORM COMMERCIAL CODE — STATUTES.

The Uniform Commercial Code provides that a buyer must notify a seller of any breach of a contract by the seller or be barred from any remedy; the burden is on the buyer to prove notice

and not upon the seller to establish that no notice had been given (MCL 440.2607[3]; MSA 17.2607[3]).

6. EVIDENCE — UNCONTRADICTED EVIDENCE — JURY.

A jury may disbelieve the most positive evidence, even when it stands uncontradicted, and the trial judge cannot take from them their right of judgment.

7. WITNESSES — EXPERT WITNESSES — QUALIFICATIONS — DISCRETION — FORMAL EDUCATION.

Determination of the qualifications of an expert witness is made by the trial court and this determination will not be reversed absent an abuse of discretion; one need not have formal education to be an expert, but may have acquired special knowledge concerning a subject by reason of his employment.

8. DAMAGES — BREACH OF WARRANTY — VALUE — PLACE OF ACCEPTANCE — STATUTES.

The normal measure of damages for breach of warranty is the difference between the value of the equipment at the time and place of acceptance and what its value would have been if it had been as warranted (MCL 440.2714; MSA 19.2714).

9. CONTRACTS — WARRANTIES — CONFLICTING PROVISIONS — UNIFORM COMMERCIAL CODE — IMPLIED WARRANTIES.

Neither party's warranty provisions become a part of a contract and the implied warranty provisions of the Uniform Commercial Code are in effect where the writings of the parties conflict as to warranties.

10. EVIDENCE — HEARSAY — BUSINESS RECORDS — FOUNDATION.

A sufficient foundation was laid for the admission of certain exhibits into evidence under the business entry exception to the hearsay rule where the exhibits consisted of purchase orders listing a description of work to be performed, a vendor's name and the vendor's quoted price and where there was testimony that the records were made in the ordinary course of business and that it was a regular practice to make such records (MCL 600.2146; MSA 27A.2146).

11. WITNESSES — FAILURE TO PRODUCE WITNESS — INSTRUCTIONS TO JURY — ADVERSE INFERENCE INSTRUCTION.

A plaintiff's requested "adverse inference" instruction, based on a defendant's failure to produce a certain witness, was properly denied where the witness was within the jurisdiction and available to the plaintiff by way of subpoena.

12. SALES — WARRANTIES — BREACH OF CONTRACT — BREACH OF
    WARRANTY — INSTRUCTION TO JURY — ACCEPTANCE OF DELIV-
    ERY — PAYMENT — DAMAGES.

   A trial court's instruction to the jury that acceptance of delivery
   and payment for a machine does not waive or bar damages for
   breach of contract or breach of warranty is a correct statement
   of the law in an action for damages for the seller's breach of
   contract or breach of warranty with respect to the machine;
   such an instruction is relevant where the question of accept-
   ance is brought up during the course of trial (MCL 440.2607[2];
   MSA 19.2607[2]).

13. DAMAGES — CONTRACTS — BREACH OF CONTRACT — OBJECT OF
    DAMAGES.

   Damages for breach of contract are intended to place the injured
   party in as good a position as he would have been in had the
   promised performance been rendered.

14. EVIDENCE — NEGATIVE EVIDENCE — NEGATIVE RESPONSE.

   Negative evidence is evidence to the effect that a circumstance or
   fact was not perceived or that it was, or is, unknown; it is
   generally of no probative value and, hence, inadmissible; how-
   ever, a negative response to a question does not necessarily
   constitute negative evidence.

15. JUDGES — BIAS — PRESUMPTIONS.

   It is presumed that a trial court is fair and impartial and a
   litigant who would challenge this presumption has a heavy
   burden.

16. SALES — DAMAGES — BREACH OF CONTRACT — BUYER'S BREACH —
    INCIDENTAL DAMAGES.

   A seller may recover from a buyer the price of goods plus
   incidental damages resulting from the buyer's breach of con-
   tract; incidental damages include any reasonable commercial
   charges, expenses or commissions incurred in stopping delivery,
   in the transportation, care and custody of goods after the
   buyer's breach, in connection with the return or resale of the
   goods or otherwise resulting from the breach (MCL 440.2709,
   440.2710; MSA 19.2709, 19.2710).

17. SALES — CONSEQUENTIAL DAMAGES — INCIDENTAL DAMAGES —
    UNIFORM COMMERCIAL CODE.

   The Uniform Commercial Code recognizes a distinction between
   incidental damages and consequential damages; incidental dam-
   ages normally are incurred when a buyer (or seller) repudiates
   a contract or wrongfully rejects the goods, causing the other to

incur such expenses as transporting, storing or reselling the goods; consequential damages do not arise within the scope of the buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealing, often with the third parties, which were a proximate result of the breach and which were reasonably foreseeable by the breaching party at the time of contracting.

18. SALES — DAMAGES — CONSEQUENTIAL DAMAGES — INCIDENTAL DAMAGES — FORESEEABILITY — INTEREST EXPENSE.

Interest expense, assuming it was foreseeable, incurred by a seller because a buyer breached a contract thereby causing the seller to have to borrow money at high interest rates, falls within the category of consequential damages, not incidental damages; the Uniform Commercial Code does not allow a seller to recover consequential damages.

19. CONTRACTS — INTERPRETATION — QUESTION OF LAW.

The meaning of language contained in a written contract which is not ambiguous is a question of law for the courts.

20. SALES — REJECTION OF GOODS — NOTICE OF REJECTION — STATUTES.

Rejection of goods must be made within a reasonable time after delivery or tender of the goods; such rejection is ineffective unless the buyer seasonably notifies the seller (MCL 440.2602[1]; MSA 19.2602[1]).

21. SALES — REJECTION OF GOODS — NOTICE OF REJECTION — REASONABLE TIME — UNDISPUTED FACTS — QUESTION OF LAW.

The question of what is a reasonable time after delivery or tender within which a buyer must notify a seller of the buyer's rejection of goods is a question of law, where the facts are undisputed.

*Turner & Turner, P.C.* (by *Carol Petsko*), for plaintiff.

*Butzel, Long, Gust, Klein & Van Zile* (by *Leslie W. Fleming* and *Richard U. Mosher*) *(Robert B. Bailey,* of counsel), for defendant.

Before: J. H. Gillis, P.J., and Beasley and R. B. Webster,* JJ.

J. H. Gillis, P.J. S. C. Gray, Inc., filed a complaint against Ford Motor Company, alleging Ford had breached two separate and unrelated contracts. In count one Gray sought to recover for work done pursuant to oral modifications of a contract involving the manufacture of a machine which assembled and tested automobile transmission pumps. In count two Gray essentially sought to recover the contract price for converting certain manually operated test stands to automatic operation.

The complaint was subsequently amended and a third count was added alleging that, as a result of Ford's failure to pay the amounts requested in counts one and two, Gray was forced to borrow money at high interest rates to carry on its business. Gray sought to recover $48,000 as compensation for this expense.

Ford brought a counterclaim for breach of contract and breach of warranty in connection with the transmission pump machine.

Count one and Ford's counterclaim were tried together. A jury returned a verdict of $157,770 in favor of Gray on its claim and no cause of action on Ford's counterclaim. The trial court, Judge Thomas J. Foley, subsequently granted Ford's motion for judgment notwithstanding the verdict and conditional new trials on both count one and the counterclaim. The trial court also granted Ford a new trial to determine damages on its counterclaim.

Finally, the trial court granted Ford's motion for a partial summary judgment on count three for

* Circuit judge, sitting on the Court of Appeals by assignment.

failure to state a claim upon which relief could be granted.

A jury trial, presided over by Judge Roman S. Gribbs, to determine the amount of damages due Ford on its counterclaim resulted in a verdict of $206,226.

The trial on count two was tried before Judge Thomas E. Roumell and a jury, resulting in a verdict in favor of plaintiff in the amount of $72,000. Ford's motion for judgment *n.o.v.* or new trial was denied as was a subsequent motion for new trial.

Gray appeals from the judgments on counts one and three and Ford's counterclaim. Ford appeals from the judgment on count two.

I

The factual situation underlying count one and Ford's counterclaim is as follows. Ford was interested in acquiring a machine which would automatically assemble and test the hydraulic pumps which are installed in automobile transmissions. The machine was initially conceived of as consisting of three parts. Ford requested quotes on the cost of designing and manufacturing the three sections. Gray submitted quotes on the second and third sections. Ford accepted these quotes and Gray commenced work on the project.

Subsequently, Gray submitted a quote on supplying the first section of the machine which Ford accepted by way of an amendment to the original purchase order.

Five additional amendments to the purchase order were made, bringing the contract price to $275,541.20. This sum was paid by Ford and is not

at issue here. Rather, it is Gray's contention that Ford agreed to pay for additional changes but never did so.

Ford's counterclaim is based upon its allegation that the machine did not meet the required specifications and that Gray had, therefore, breached its contract as well as an express warranty.

In ruling upon the post-trial motions, Judge Foley held that while Gray alleged there was an agreed upon formula for determining the price of a particular change, the evidence in support of damages was not based upon this formula. Instead a "reasonable market value or reasonable value" was relied upon to ascertain damages.

In addition, Judge Foley ruled that the jury verdict was, in part, contrary to the express agreement of the parties and the evidence adduced at trial and included damages not supported by factual proof. By way of an amended order, Judge Foley granted judgment notwithstanding the verdict to Ford on Gray's claim.

Judge Foley also granted judgment notwithstanding the verdict to Ford on its counterclaim ruling that no issue of fact was created by the evidence and that Gray was liable for breach of contract and breach of warranty. A new trial, limited to the issue of damages, was granted. This trial resulted in an award to Ford of $206,226.

The first issue raised for our consideration is whether Judge Foley erred in granting judgment notwithstanding the verdict on Gray's claim that it was entitled to payment for additional work done on the machine.

Gray contends that there was an oral modification to the contract. "Doc" Mapes, a Ford processing engineer in charge of the project, allegedly agreed that requested changes in the design and

construction of the machine would be paid for according to Gray's hourly rate.

At the outset Ford argues that oral modifications to the contract were precluded, since a provision to that effect was contained on the reverse side of its purchase order which constituted, along with Gray's original quote, the contract. However, Richard Gray, vice-president of S. C. Gray, Inc., testified that upon receipt of the Ford purchase order he called Mr. Krolicki of Ford's purchasing department and objected to the terms and conditions contained on the form.

Section 2-207 of the Uniform Commercial Code, MCL 440.2207; MSA 19.2207, provides that additional terms contained in an acceptance are to be construed as proposals for addition to the contract. As between merchants, they become part of the contract unless "notification of objection to them has already been given or is given within a reasonable time after notice of them is received".

Assuming the trier of fact believed the testimony of Mr. Gray that he objected to the terms and conditions contained on Ford's form, then, pursuant to the above section, the provision requiring modifications to be in writing did not become part of the contract.[1]

Having determined that Gray was not precluded from showing oral modifications to the contract, we must next determine whether the trial court was correct in finding that plaintiff's evidence of damages was insufficient to support the verdict. The trial court noted that although plaintiff contended the contract price for changes was to be

---

[1] In addition, since the machine was to be specially manufactured for the buyer and not suitable for sale in the ordinary course of the seller's business, modifications did not have to be in writing to satisfy the statute of frauds. UCC § 2-201(3)(a), MCL 440.2201(3)(a); MSA 19.2201(3)(a).

computed by multiplying Gray's hourly rate by the number of hours spent on a change, the evidence of damages was based upon a "reasonable value" determination.

The evidence to support plaintiff's damages was supplied by Richard Gray. He testified that he did not keep records of the number of hours spent in making the changes for which he sought additional compensation. Instead, he gave his opinion as to the reasonable value of the changes.

Plaintiff points to testimony that Mr. Gray estimated the number of hours it took to make each change and then multiplied that by the hourly rate. Plaintiff contends that this testimony shows the claim for each change was based on the agreed upon formula.

We do not find this testimony in conflict with the trial court's determination that plaintiff's evidence of damages was based upon reasonable value. On cross-examination Mr. Gray admitted that while he estimated it took approximately 160 hours to do a particular change he did not know whether, in fact, it took 160 or 260 hours. Hence, it is evident that plaintiff's itemization of damages had no relation to the actual hours spent on a change, but instead was based upon an estimate of a reasonable price for each change.

Where the parties have intended to make a contract but left the price term open, the price will be a reasonable price. UCC 2-305, MCL 440.2305; MSA 19.2305. However, in the instant case the price term was not left open. Hence, "reasonable value" is not the proper measure of damages.

The party asserting a claim has the burden of proving his damages with reasonable certainty. *Thornton Construction Co, Inc v Mackinac Aggre-*

*gates Corp,* 9 Mich App 467; 157 NW2d 456 (1968). Here, plaintiff's proofs were unduly speculative. Having alleged an agreed upon formula for determining the price of the changes, it was incumbent upon plaintiff to prove damages by means of that formula and not upon a theory of the reasonable value of the changes.

We conclude the trial court did not err in granting judgment *n.o.v.* Because of our discussion of the above issue we need not discuss plaintiff's remaining arguments concerning this claim.

## II

Plaintiff next claims that Judge Foley erred by granting a partial judgment *n.o.v.* on the issue of liability to Ford on its counterclaim. In support of this contention plaintiff argues that the evidence created an issue of fact concerning (1) the failure of a portion of the machine to operate, and (2) whether Ford gave notice of the breach of warranty.

In ruling on a motion for judgment notwithstanding the verdict, the standard is whether, after reviewing the facts and all legitimate inferences therefrom in the light most favorable to the party opposing the motion, reasonable men could differ. If they can, the question is for the jury. *Sparks v Luplow,* 372 Mich 198; 125 NW2d 304 (1963), *Isom v Farrugia,* 63 Mich App 351; 234 NW2d 520 (1975).

The undisputed evidence indicates that the machine was never operated sufficiently to be used for the testing of pumps for production.

Gray points to testimony that at a tryout held in April, 1971, the machine ran for approximately

one hour. While the machine ran at that time, subsequent examination revealed that the pumps were being damaged when inserted into the test stand.

Gray also cites the testimony of Herbert Joyner that the design of the machine was a good one and should work. As the trial court noted, this evidence did not create a question of fact of whether the machine actually did work. Even Ford employee Wedemeyer testified that the machine ran "like a charm" at one time when he let it cycle without any oil pumps in it. However, once he put one in the machine it started malfunctioning.

The trial court did not err in ruling that no question of fact was presented concerning the failure of the machine to operate properly. Even considering testimony that some of the problems Ford encountered with the machine were due to misuse, reasonable minds could not differ in concluding that the machine as delivered by Gray did not perform as required.

The next question is whether a question of fact was created concerning notice. Section 2-607(3) of the UCC, MCL 440.2607(3); MSA 17.2607(3), provides that the buyer must notify the seller of a breach or be barred from any remedy.

It is beyond dispute that Gray knew there were problems with the machine prior to the final try-out date in April, 1971. However, the only evidence that Ford gave notice after April, 1971, was the testimony of Edward Howe. He stated that he spoke to Sidney and Dick Gray and informed them of the problems Ford was having. While this evidence was not contradicted, the jury was not required to accept it as true. Mr. Howe may have been biased since he was an employee of Ford. Moreover, Gray's counsel did not concede the no-

tice issue and attempted to discredit Mr. Howe's testimony on cross-examination.

As was stated long ago in *Woodin v Durfee,* 46 Mich 424, 427; 9 NW 457 (1881):

"The most of these facts the claimant insists are entirely undisputed on the evidence; and she claims that they establish beyond question the liability of Staley on the bond, and that the judge was at liberty to so instruct the jury. But the difficulty is that the facts were not conceded or beyond dispute: there was evidence of them which probably ought to have satisfied any one to whom it was addressed; but evidence is for the jury, and the trial judge cannot draw conclusions for them. It is said that on some points there was no evidence of a conflicting nature; but that does not aid the claimant. *A jury may disbelieve the most positive evidence, even when it stands uncontradicted; and the judge cannot take from them their right of judgment.* If they return what he thinks is a perverse verdict, he may set it aside and order a new trial; but he cannot take upon himself their functions as was done here." (Emphasis supplied.)

This rule has been reiterated on numerous occasions throughout the years. *Yonkus v McKay,* 186 Mich 203; 152 NW 1031 (1915), *Crampton v Crampton,* 205 Mich 233; 171 NW 457 (1919), *Cebulak v Lewis,* 320 Mich 710; 32 NW2d 21 (1948), *Hopkins v Lake,* 348 Mich 382; 83 NW2d 262 (1957), *People v Jackson,* 390 Mich 621; 212 NW2d 918 (1973).

Ford argues that it is improper to rely upon the untruthfulness of the testimony of a witness as establishing the truthfulness of an inverse factual proposition, citing *Employment Relations Comm v Cafana Cleaners, Inc,* 73 Mich App 752; 252 NW2d 536 (1977). Nevertheless, in the instant case the burden was on Ford to prove notice and not upon

Gray to establish that no notice had been given. *Steel & Wire Corp v Thyssen Inc,* 20 UCC Rep Serv 892, 895 (ED Mich, 1976). Assuming the jury disbelieved the testimony of Mr. Howe, the burden of proof remained unsatisfied. Hence, a verdict adverse to Ford was not improper.

We conclude the trial court erred in granting judgment *n.o.v.* to Ford on its counterclaim. Hence, the case is remanded for a new trial.

### III

Gray also contends that numerous errors occurred during the trial before Judge Gribbs on the issue of Ford's damages. Our review of the record convinces us that a new trial on this issue is also necessary.

Gray first argues that the trial court erred in allowing one of Ford's witnesses, Herman Wedemeyer, to testify to the scrap value of the test stands and preheat tank.

Determination of the qualifications of an expert witness is made by the trial court and this determination will not be reversed absent an abuse of discretion. One need not have formal education to be an expert, but may have acquired special knowledge concerning a subject by reason of his employment. *People v Ebejer,* 66 Mich App 333; 239 NW2d 604 (1976). Here, the trial court allowed Mr. Wedemeyer to testify as to these matters based upon his background, experience, and familiarity with the equipment. We find no abuse of discretion.

The next issue raised by Gray concerns the measure of damages. The only evidence upon which to base damages was testimony as to the price, the fact that the equipment was never used

for production, and the scrap value. The normal measure of damages for breach of warranty is the difference between the value of the equipment at the time and place of acceptance and what its value would have been if it had been as warranted. MCL 440.2714; MSA 19.2714. There was no evidence of the actual value of the equipment at the time of acceptance, although it may well have had some value since there was testimony that the test stands could be easily converted to manual operation and used as backups if automatic stands were being repaired. Evidence of only purchase price and salvage value is inadequate to support an award for breach of warranty under these circumstances. See *Western Construction Co v R G Moeller Co,* 1 Mich App 230; 135 NW2d 569 (1965).

In *Western,* the Court remanded for the taking of testimony of actual value of the machine at the time and place of acceptance. However, since we have already determined that a new trial is necessary on the issue of liability the appropriate remedy here is to remand the entire matter for a new trial on both the issues of liability and damages.

Because of our determination that a new trial should be held we address only those issues which are likely to arise again.

There is a dispute over which warranty provision controlled. Gray's offer contained the following warranty:

"We warrant the workmanship for one (1) year after date of shipment and all standard component parts as warranted to us by our suppliers."

Ford's purchase order contains the following clause:

"Seller warrants that the supplies covered by this

purchase order will conform to the specifications, drawings, samples, or other description furnished or specified by Buyer, and will be fit and sufficient for the purpose intended, merchantable, of good material and workmanship, and free from defect. The warranties and remedies provided for in this Paragraph and Paragraph 7 (Inspection) shall be in addition to those implied by or available at law and shall exist notwithstanding the acceptance by Buyer of all or a part of the supplies with respect to which such warranties and remedies are applicable."

Where the writings of the parties conflict as to warranties, neither provision becomes a part of the contract and the UCC implied warranties are in effect. *Bosway Tube & Steel Corp v McKay Machine Co,* 65 Mich App 426; 237 NW2d 488 (1975).

Gray contends *Bosway* is not controlling since Gray objected to the terms and conditions of Ford's purchase order, one of which was the warranty provision. However, we see no reason why this objection should change the result. The reason for discarding both provisions where there is a conflict in the writings is because it is assumed that each party objected to the other's clause. See UCC 2-207, Official Comment 6. Hence, Gray's objection added nothing more. Had Gray wanted its warranty to control it should have taken additional steps to procure Ford's consent.

Gray also contends it would be unfair to resort to the UCC implied warranties since they were substantially the same as those contained in Ford's form, to which Gray objected. However, Gray's oral objection to the terms and conditions of Ford's form was insufficient to exclude the UCC implied warranties. See MCL 440.2316; MSA 19.2316. Hence, we see no reason why Gray should not be held to such warranties.

While the case was tried on the theory of breach of the express warranty contained on Ford's form, a new trial perhaps could be based upon implied warranties.

Gray also contends that certain exhibits consisting of purchase notifications to various suppliers was erroneously admitted into evidence. Although these exhibits were not listed in the pretrial statement, we can foresee no possible prejudice to Gray should they be admitted at a new trial. Hence, we address only the claim that they did not fall within the business entry exception to the hearsay rule. MCL 600.2146; MSA 27A.2146.

The exhibits consisted of purchase orders listing a description of work to be performed, a vendor's name, and the vendor's quoted price. There was testimony that the records were made in the ordinary course of business and that it was a regular practice to make such records. This is a sufficient foundation for the admission of the records. *People v Kirtdoll,* 391 Mich 370, 390, fn 11; 217 NW2d 37 (1974).

While the records did not disclose whether the work was done or the price paid, they were memoranda of the agreements entered into by Ford and its vendors. Entering into an agreement would be an "act, transaction, occurrence or event" within the meaning of the statute.

Likewise it was not error to admit a series of photographs of the machine taken in 1975, after various changes had been made by Ford. It was clearly explained to the jury that the photographs were not intended to depict the machine as it appeared at the time of delivery. See *Eastman v Ann Arbor R Co,* 4 Mich App 540; 145 NW2d 252 (1966), *Jackson v Sabuco,* 21 Mich App 430; 175 NW2d 532 (1970).

The next several arguments concern the instructions given to the jury. Gray's request that an "adverse inference" instruction, SJI 5.01(3), be given was properly denied since the witness was equally available to either party. *Barringer v Arnold,* 358 Mich 594; 101 NW2d 365 (1960), *Urben v Public Bank,* 365 Mich 279; 112 NW2d 444 (1961). While the witness was an employee of Ford, he was within the jurisdiction and was available to Gray by way of subpoena.

The trial court's instruction that acceptance of delivery and payment for the machine does not waive or bar damages for breach of contract or breach of warranty was a correct statement of the applicable law. MCL 440.2607(2); MSA 19.2607(2). Moreover, the instruction was relevant since the question of acceptance was brought up during the course of the trial.

The trial court also instructed the jury that "the buyer is entitled to recover as damages the loss resulted in the ordinary course of events from the sellers *[sic]* breach as determined in any manner which is reasonable". This instruction is essentially a paraphrase of UCC 2-714(1). Gray contends, and we agree, that it would be more appropriate to instruct the jury in accordance with § 2-714(2),

"The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." MCL 440.2714(2); MSA 19.2714(2).

While this rule is not meant to be exclusive, it is the usual, standard and reasonable method and the record fails to disclose any reason why it should not be applied in this case.

Ford contends that the instruction given was appropriate because there was a breach of contract as well as a breach of warranty. Damages for breach of contract are intended to place the injured party in as good a position as he would have been in had the promised performance been rendered. *Allen v Michigan Bell Telephone Co,* 61 Mich App 62; 232 NW2d 302 (1975). Here, if the jury is instructed in accordance with § 2-714(2), along with appropriate instructions on consequential and incidental damages, § 2-715, Ford will be fully compensated for its loss. Hence, at a new trial the court should instruct the jury in accordance with UCC § 2-714(2) and § 2-715.

The trial court also instructed the jury that if a negative response is given to a question, the question is meaningless and should be disregarded. This instruction was misleading and should not be repeated.

Negative evidence is evidence to the effect that a circumstance or fact was not perceived or that it was, or is, unknown. *Serinto v Borman Food Stores,* 380 Mich 637; 158 NW2d 485 (1968), 4 Callaghan's Michigan Pleading & Practice (2d ed), § 36.193, p 28. It is generally of no probative value and, hence, inadmissible. However, a negative response to a question does not necessarily constitute negative evidence. For example, if the defendant in a murder trial were asked if he killed the victim and his response was "no", the evidence would obviously not be meaningless and by no means should it be disregarded. The trial court's instruction was, therefore, erroneous.

Gray's final claim is that Judge Gribbs evidenced bias, thereby depriving Gray of a fair trial. It is presumed that a trial court is fair and impartial and a litigant who would challenge this pre-

sumption has a heavy burden. *Mahlen Land Corp v Kurtz,* 355 Mich 340; 94 NW2d 888 (1959). Our review of the record fails to disclose bias on the part of the trial court.

## IV

Judge Foley granted Ford's motion for summary judgment on count three of the complaint ruling that Gray had failed to state a claim for which relief could be granted. In that count Gray sought to recover for interest it paid on loans taken out to maintain the business when Ford failed to pay the money Gray claimed was due.

A seller may recover the price plus incidental damages resulting from the buyer's breach. MCL 440.2709; MSA 19.2709. Incidental damages include:

"[A]ny commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." MCL 440.2710; MSA 19.2710.

The difference between incidental and consequential damages was highlighted in *Petroleo Brasileiro, SA v Ameropan Oil Corp,* 14 UCC Rep 661, 667 (ED NY, 1974), wherein the court stated:

"While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem

from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."

While plaintiff attempts to characterize the interest it paid out as incidental damages, we think, assuming it was foreseeable, it falls within the category of consequential damages. The UCC does not allow the seller to recover consequential damages.

Hence, the trial court's decision on this point was correct.

## V

The trial on count two of the complaint involved an entirely separate contract than the one under consideration in the first portion of this opinion.

Ford had six testing machines at its Livonia transmission plant called "XPL Main Control Test Stands". These machines were used to perform 30 different tests on the main control valve of an automatic transmission in order to insure that it worked properly. The test stands were operated manually and were capable of testing 35 parts per hour.

Ford requested quotations from various vendors, including Gray, for a price and delivery date to convert the test stands to automatic operation with an electrical readout system with production capability of 420 parts per hour. Gray submitted a quote containing options of 60 pieces per hour per machine or 70 pieces per hour per machine. Ford accepted the latter option and Gray proceeded with the project.

When Gray encountered difficulties, the delivery date was extended by mutual agreement to August 12, 1971. On August 11, 1971, Ford sent a telegram to Gray indicating that unless the test stands were satisfactorily completed by August 12, 1971, the order would be cancelled by default.

On the latter date a Ford team visited the Gray plant. The machines were capable of accurately testing only 40-45 parts per hour. Another tryout was held on August 19, 1971, which again proved unsuccessful.

On August 25, 1971, Ford sent a telegram to Gray cancelling the contract.

Gray brought suit for the contract price claiming the contract called for an electronic package capable of driving the test stands automatically at the rate of 70 parts per hour and not to undertake to redesign the entire machine to make it capable of accurately testing parts at that rate.

Ford's motions for summary judgment and directed verdict were denied by the trial court and a jury returned a verdict of $72,000 in favor of Gray.

Ford raises five issues on appeal. First, it is contended that the contract is unambiguous and it was error to submit its interpretation to the jury.

Ford's request for quotation included the following:

"Quote firm price and delivery to convert (6) existing XPL main control test stands to automatic operation with electrical accept-reject light read-out, retaining the manual capability. 'All quotations, for valid consideration, shall conform with the requirements of the Ford production Mach. & Equipment Procurement Handbook, and additional specifications listed.' Electrical spec. form 2630 sheets 1 thru 4, Hydraulic spec. form 2631 sheets 1 thru 4, Pneumatic Part spec. form 2632 sheets 1 thru 4, Noise Control, Lubrication specs dated

12-26-69 sheets 1 thru 4.
"Part Name: XPL Main Control     Production: 420/hr."

The quotation submitted by Gray and subsequently accepted by Ford provided for the following modification to be made to the test stands:

"I. BASIC MACHINE

"Existing test stand will be re-worked to remove kickdown actuator, shift selector, governor pressure control, main line flow control and throttle and governor flow meters.

\*     \*     \*

"II. FIXTURE

"Automatic shift mechanism and kickdown actuator will be added to test stand.

\*     \*     \*

"III. HYDRAULIC SYSTEM

"Variable pressure generator will be provided to simulate governor pressure. Programmable flow control valve with flow meter readout will be provided to supply test oil.

\*     \*     \*

"IV. ELECTRICAL & ELECTRONIC CONTROL SYSTEM

"Option A

"Electrical control system will be expanded and installed in larger electrical control panel. Pushbuttons will be provided to control automatic shift mechanism, kickdown actuator, variable pressure generator and flow control valve. Strain gage type transducer will be provided to monitor governor pressure. Potentiometric type transducers will be provided to monitor reverse clutch and main line pressure.

"Electronic instrumentation such as signal conditioning hardware, high/lor limit comparators, logic circuitry, throttle blow off detector, etc. will be provided to monitor and display the results of each test. Provisions

will be made to test (12) models of the XPL main control assembly.

\* \* \*

"Option B

"Contains hardware described in Option A and includes additional instrumentation to decrease cycle time.

\* \* \*

"V. ASSEMBLY AND TRYOUT

"Complete system to be assembled and evaluated at S. C. Gray, Incorporated. System to be approved by Ford Motor Company personnel before shipment \* \* \*

"(6) Machines — Total Build (Option A) .... $18,000 ea.
"(6) Machines — Total Build (Option B) .... $19,500 ea.
Total Design (Option A) ....... $ 4,100 lot
Total Design (Option B) ....... $ 4,600 lot

"The above prices are F.O.B. our plant Detroit, Michigan and our terms are 1/4% 10 days, Net 30 days.

"Estimated cycle time 60 pieces/hour per machine (Option A) or 70 pieces/hour per machine (Option B)."

Ford accepted option B, calling for a cycle time of 70 pieces per hour per machine.

There was testimony that if the speed was set to run at 70 parts per hour the electronic package would run through a complete test cycle. However, at any rate higher than 40 or 45 parts per hour the stands did not give accurate readouts.

Ford contends the contract was unambiguous and called for Gray to do whatever was necessary to get the test stands to automatically run accurate tests at 70 parts per hour. Gray contends the contract merely required them to manufacture electronic units necessary to automate the existing stands, with the minimal alterations to the stands themselves necessary to attach these electronic units.

The trial court ruled, and we agree, that there is

some ambiguity in the contract. It should be noted that in the Gray quotation the work to be done was broken down into five categories. The heading under which Gray offered the options of 60 or 70 parts per hour is "Electrical and Electronic Control System". Thus, Gray's contention that they undertook to provide an electronic system capable of driving the test stands at 70 parts per hour and did not agree to rework the entire machine to make it capable of accurately testing 70 parts per hour is not entirely unreasonable.

Where the language of a writing is not ambiguous, its construction is a question of law for the court and it is error to submit the matter to the jury. *Craib v Committee on National Missions of the Presbytery of Detroit of the United Presbyterian Church, USA,* 62 Mich App 617; 233 NW2d 674 (1975). Here, the contract was somewhat ambiguous. Hence, the trial court did not err in submitting the question to the jury.

Ford also contends that it was error to submit the question of timely notice of Ford's intent to cancel the contract.

According to UCC § 2-602(1) goods must be rejected within a reasonable time after delivery or tender. It is ineffective unless the buyer seasonably notifies the seller. MCL 440.2602(1); MSA 19.2602(1).

The testimony of Richard Gray indicates that at the August 12, 1971, tryout the electronic package drove the test stands at 70 parts per hour but, due to the capabilities of the basic machine, accurate test results were not achieved. At the final tryout, held August 19, 1971, the accurate readings were achieved at 40 to 50 parts per hour. However, at that time, according to Mr. Gray, the Ford personnel indicated that "it wasn't working at 70, so they

didn't want it". A telegram cancelling the contract was also sent 6 days later.

Where the facts are undisputed the question of what is a reasonable time is a question of law. *Dulany-Vernay Co v Kalamazoo Stationery Co,* 213 Mich 484; 181 NW 984 (1921), *Reinforced Concrete Pipe Co v Boyes,* 180 Mich 609; 147 NW 577 (1914).

Here, it is undisputed that oral notice was given on the date of inspection and written notice followed six days later. We conclude that as a matter of law notice of rejection was given within a reasonable time. Hence, the trial court should not have submitted the question to the jury.

Plaintiff's contention that Ford was required to give notice of intent to cancel for late delivery is unfounded in light of Mr. Gray's testimony that the reason for rejection was the failure of the machine to test accurately at 70 parts per hour.

In addition, the issues of impossibility of performance and mutual mistake had no place in this case. Ford did not assert them as a defense, and they were irrelevant to Gray's claim that they had substantially performed the contract and were entitled to the agreed upon price.

Because of our determination that the only issue properly submitted to the jury was the matter of contract interpretation, we conclude the case must be remanded for a new trial. The remaining allegations of error are thereby rendered moot.

The judgments below on counts one and three are affirmed. The judgments on count two and the counterclaim are reversed and remanded for new trials. No costs, neither party having prevailed in full.