*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MONTAPLAST OF NORTH AMERICA, INC.,

        Plaintiff-Appellant/Cross-Appellee,

v

PROPER TOOLING, LLC,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
August 17, 2023

No. 363217
Macomb Circuit Court
LC No. 2021-004171-CB

Before: GADOLA, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Montaplast of North America (hereinafter Montaplast) appeals by right the trial court's order granting in part Proper Tooling's motion for an order to show cause. Montaplast argues that the trial court erred by ordering it to pay damages for its purported breach of contract because Proper Tooling was required to file a new complaint rather than a motion for an order to show cause and because Montaplast did not owe any damages for the outstanding balance sought by Proper Tooling. Proper Tooling cross-appeals, arguing that it was entitled to the entire contested amount, not the amount offset by the speculative costs offered by Montaplast. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a dispute regarding the cost of "tuning"[1] services for two tools Montaplast purchased from Proper Tooling. The tools in question are identified as Tool #10424-

---

[1] According to Proper Tooling's Chief Financial Officer, Blaise Flack:

> "Tuning" is part of the normal manufacturing process for plastic injection molding tools. It consists of making post-fabrication adjustments to the tool so that the tool produces parts consistent with the customer's specifications. Following the fabrication of a tool, the tool will be tested to determine whether tuning is necessary. Tuning does not include modifications to the tool beyond the design

000 (Tool 000) and Tool #10424-100 (Tool 100). This case consists of two phases, with only the second phase being at issue on appeal. The first phase began when Montaplast filed suit alleging two counts: (1) replevin/claim and delivery, and (2) breach-of-contract. Montaplast purchased various tools from Proper Tooling, but conflicts arose between the parties concerning payment and delivery. The parties ultimately settled on schedules for payment and delivery, which the trial court incorporated into a stipulated order of dismissal without prejudice.

Montaplast took delivery of the tools but after what Montaplast alleges were multiple untimely deliveries, which allegedly violated the stipulated order, Montaplast terminated the remainder of the contract under the original contract's terms and conditions. The remainder of the contract only consisted of Proper Tooling tuning the tools. Montaplast sought a discount on the final contract price of $539,600 which Montaplast calculated was the value of the tuning services. Montaplast based the discount on the two sets of quotes Montaplast received from Proper Tooling. The first quote did not include tuning as a line item. The subsequent quote stated that it included tuning and increased the price of the contract by $539,600. Proper Tooling moved for an order to show cause why Montaplast should not be held in contempt for violating the trial court's order by failing to pay the amount owed under the payment schedule. In response, Montaplast argued that the order was essentially a settlement agreement subject to contractual interpretation, that Proper Tooling was required to file a new lawsuit alleging breach-of-contract, and that even if Proper Tooling adhered to the proper procedural requirements, there was a genuine issue of material fact regarding whether Montaplast owed the contested amount. After various hearings and supplemental briefings, the trial court granted Proper Tooling's motion in part, ordering Montaplast to pay Proper Tooling the difference between the amount outstanding and the amount that the trial court found that the tuning would cost Proper Tooling. Montaplast now appeals, arguing that the trial court deprived it of its procedural due-process rights by adjudicating a motion for an order to show cause, which had fewer procedural safeguards, when the correct course of action for Proper Tooling would have been filing a new complaint alleging breach of contract. Additionally, there were genuine issues of material fact regarding whether Montaplast owed Proper Tooling any money at all. Proper Tooling cross-appeals, arguing the trial court erred by subtracting Montaplast's estimated costs to procure tuning of the tools from an alternative vendor because it did not properly reflect Proper Tooling's cost savings from not having to perform the tuning.

## II. ANALYSIS

### A. CONTEMPT

Montaplast argues that the trial court violated its procedural due-process rights by adjudicating what was actually a breach-of-contract claim as a motion for an order to show cause. We disagree.

---

specifications or to address design modifications, such as texturing, to the parts intended to be produced.

"This Court reviews a trial court's decision regarding a contempt motion for an abuse of discretion." *DeGeorge v Warheit*, 276 Mich App 587, 591; 741 NW2d 384 (2007). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016) (footnote and citation omitted). "A trial court necessarily abuses its discretion when it makes an error of law." *Id.* (footnote and citation omitted). "Whether due process has been afforded is a constitutional issue that is reviewed de novo." *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277; 831 NW2d 204 (2013).

The order Proper Tooling sought to enforce was titled: "Stipulated Order of Dismissal Without Prejudice." While Proper Tooling's motion was labeled as one seeking contempt, this was not what it actually was, or how the trial court handled the matter. "Courts are not bound by the labels that parties attach to their claims." *Buhalis v Trinity Continuing Care Servs*, 296 Mich App 685, 691; 822 NW2d 254 (2012). The order was entered to embody the parties' agreement regarding a schedule for delivery and payment. However, the trial court incorporated the parties' agreement into its order, and reserved the power to enforce the order in the future. "A trial court has inherent and statutory authority to enforce its orders." *In re Moroun*, 295 Mich App 312, 331; 814 NW2d 319 (2012). The dispute giving rise to this portion of the case directly concerned the schedule incorporated into the order and, therefore, the trial court had inherent authority to enforce the schedule. *Id.*; See also MCL 600.611 ("Circuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit courts' jurisdiction and judgments."). Indeed, Montaplast does not dispute that it never actually was held in contempt. In sum, Proper Tooling's motion sought to enforce the schedules provided in the trial court's order, and the trial court's order granting Proper Tooling's motion merely awarded damages; it did not hold Montaplast in contempt.

Montaplast argues that the trial court lacked enforcement powers because a stipulated order of dismissal is a settlement agreement, and a settlement agreement is enforced by filing a complaint for breach of contract. For support, Montaplast relies on *Acorn Investment Co v Michigan Basic Prop Ins Ass'n*, 495 Mich 338, 355-356; 852 NW2d 22 (2014), in which our Supreme Court said, "A stipulated order of dismissal based on a settlement agreement is not a 'judgment' in the sense that it is not a final determination by the *court* of the rights and obligations of the parties." However, Montaplast has taken this quotation out of context. In *Acorn*, the Supreme Court was determining whether a stipulated order of dismissal could be considered a "verdict" for the purposes of since-repealed MCR 2.403(O), which provided for sanctions if a party rejected a case evaluation then did not obtain a verdict that was more favorable. *Id.* at 355. Accordingly, we disagree with Montaplast's contention that *Acorn* can be construed to suggest that courts do not have the authority to enforce a stipulated order of dismissal.[2]

Further, it is unclear to us how Montaplast would have been better off if the court had required Proper Tooling to file a complaint rather than proceeding as it did. While it is true civil contempt proceedings are "only entitled to 'rudimentary' due process protections," *In re Contempt*

---

[2] We agree with Montaplast that a stipulated order of dismissal ought to be treated as a contract to the extent that such an order is interpreted with the end goal of ascertaining the intent of the parties.

*of Pavlos-Hackney*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No 357407); slip op at 14, Montaplast was given multiple opportunities to present its defense and argue its case. The trial court ordered multiple briefings and the submission of proofs, and it held multiple hearings. Montaplast has failed to identify any additional procedural right, besides discovery, which was lacking during this phase of the case. Further, Montaplast has not identified anything useful that discovery would have yielded. Montaplast was given numerous opportunities to present documentary evidence, and it expressly declined an opportunity to present testimony at an evidentiary hearing.

In conclusion, whether the trial court had the power to hold Montaplast in contempt on the basis of the stipulated order is irrelevant, because that is not what happened. The trial court merely enforced its own order, as it was entitled to do. Therefore, the trial court acted within the scope of its authority.

## B. AMOUNT OWED AND DAMAGES

In this case, Montaplast viewed the purchase of the tools and the purchase of the tuning services as two separate transactions. Montaplast argued that, pursuant to the terms of the agreement, that it would not need to pay for the tuning if it canceled the transaction after acceptance of the tools but before the tuning services were performed. Thus, Montaplast did not believe it was obligated to pay the $539,600 that it viewed as having been allocated for the tuning services.[3] Montaplast reached this figure by determining the difference in price between a quote that did not include the tuning services and a subsequent quote that did. The trial court, however, did not agree with Montaplast's position that the purchase of the tools and the tuning services were two separate transactions. The court found that the parties negotiated the cost of tuning as part of the cost of purchasing the tools and that "[t]he inclusion of tuning services in the quote, followed by an increased price, does not divide the tool from the tuning regarding the payment obligation."

Nevertheless, the trial court determined that it would constitute a windfall for Proper Tools if it could recover the entire contract price without performing the tuning services. Thus, the trial court concluded that "Proper Tooling is entitled to $539,600 less any of its savings from not having to perform the tuning and coating work" because it "will clearly save money by not performing the tuning and coating services." Proper Tooling argued that it would only save $131,000, but the court was persuaded that the services were actually worth $308,731 because that is the figure Montaplast claimed to have paid a third party to have the tuning completed after it canceled the contract. Thus, Montaplast was ordered to pay Proper Tooling $230,869 to satisfy its outstanding debt.

---

[3] Montaplast received quotes for the pair of tools on January 19, 2021 and again on January 20. The January 20 quotes listed tuning services as "INCLUDED" in the purchase price while the January 19 quotes did not; this was the only difference between the two sets of quotes. The January 19 quotes indicated prices of $735,500 for Tool 000 and $650,000 for Tool 100 while the January 20 quotes indicated prices of $1,021,950 and $903,150, respectively. Thus, Montaplast deduced that the price for tuning must have been $286,450 for Tool 000 and $253,150 for Tool 100.

Neither party agrees with the trial court's decision that Montaplast pay Proper Tooling $230,869. On appeal, Montaplast argues that the unperformed tuning services were worth $539,600 and that the trial court erred by finding the services to only be worth $308,371. Montaplast argues that it is "entitled to a credit in the full amount of the unperformed tuning services." Montaplast disagrees with the trial court's conclusion that tuning could not be separated from the purchase of the tools because such a separation was made in Proper Tooling's quotes. On cross appeal, Proper Tooling argues that the trial court erred by reducing the purchase price to prevent a "windfall" and that Montaplast should have been ordered to pay the full $539,600 remaining on the contract because that was the figure provided in the stipulated order of dismissal. Proper Tooling argues that if a modification for these savings was warranted then the trial court nonetheless erred by relying on Montaplast's estimated market costs. Proper Tooling submits that damages must be ascertained with reasonable certainty, that Montaplast did not prove its estimates with reasonable certainty, and that it was inappropriate to use market costs to calculate the offset because market costs include profits.

## 1. SEVERABILITY OF TUNING FROM PURCHASE PRICE

The trial court did not err by interpreting the sale and tuning of the tools as a single transaction that could not be severed.

This Court reviews questions of contractual interpretation de novo. *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416, 422; 952 NW2d 576 (2020). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties; to this rule all others are subordinate." *Joseph & Anita Russell Trust v Russell*, 338 Mich App 170, 179; 979 NW2d 672 (2021) (quotation marks and citation omitted). To accomplish this, a court must "examine the language of the contract according to its plain and ordinary meaning." *Ingham Co v Mich Co Rd Comm Self-Ins Pool*, 508 Mich 461, 477; 975 NW2d 826 (2021). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Cadillac Rubber & Plastics*, 331 Mich App at 422 (quotation marks and citation omitted).

The record supports the trial court's conclusion that the parties' intent was that the tuning services be included as part of the purchase of the tools. First, while the quotes list the items and services included in the price, the price is not itemized. Rather, there is only one total price for everything included in the transaction. Moreover, Proper Tooling's Chief Financial Officer, Blaise Flack, stated in an affidavit that tuning was "part of the normal manufacturing process" for the tools Montaplast purchased, and this further suggests that the parties intended that the purchase and tuning be one transaction. Flack explained that Montaplast was not charged "separately for the tuning because the service was included in the price of each tool." Finally, this interpretation is consistent with the parties' course of dealing as the record suggests that they had never previously separated the sale of the tools from the tuning.

Therefore, the trial court properly concluded that the sale and tuning of the tools was intended by the parties to be a single, nonseverable transaction.

## 2. REDUCTION OF PURCHASE PRICE

Proper Tooling takes exception with the trial court's decision to reduce the amount owed to it by the amount of money it would save by not having to perform tuning services. Proper Tooling submits that Montaplast should have been ordered to pay the entire outstanding balance of $539,600 because that was the amount specified in the stipulated order of dismissal. However, we agree with the trial court that declining to reduce the payout would have resulted in a windfall for Proper Tooling. Damages available pursuant to the Uniform Commercial Code (UCC), MCL 440.1101 *et seq.*, "are intended to place the injured party in as good a position as he would have been in had the promised performance been rendered." *Sullivan Indus, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 346; 480 NW2d 623 (1991), quoting *S C Gray, Inc v Ford Motor Co*, 92 Mich App 789, 810; 286 NW2d 34 (1979). The parties' intent was that Proper Tooling would spend money to complete the tuning process and that Montaplast would pay Proper Tooling the additional $539,600. If the court did not reduce the amount owed to Proper Tooling then it would receive the $539,600 without also spending money to complete the tuning process. Thus, such a remedy would have placed Proper Tooling in a better position rather than as good a position. Therefore, the court did not err by reducing the outstanding balance in order to avoid such a windfall.

### 3. VALUE OF TUNING AND COATING SERVICES

The trial court's finding that Proper Tooling saved $308,731 by not performing tuning services was supported by the record and, thus, not a clear error.

"The trial court's factual findings are reviewed for clear error." *DeGeorge*, 276 Mich App at 591. "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id.*

The record supported the court's finding that Proper Tooling saved $308,731 by not performing the tuning services. The evidence available to the court regarding the cost of performing the tuning was scarce. The court could have found that the cost of tuning was $539,600 as this was the difference between the prices of the quotes that did and did not list tuning. However, it was not a clear error for the court to have been unconvinced that this represented the cost that would be incurred by Proper Tooling if it performed the tuning because the evidence regarding the difference in the prices of these quotes was ambiguous, and this price likely included profits Proper Tooling would earn in addition to the actual expense of performing the service. Proper Tooling asserted in its July 8, 2022 supplemental brief that the actual cost of tuning was $131,000, but there was no evidence supporting this assertion. Thus, the trial court was correct not to rely on that figure. The only *evidence* Proper Tooling produced regarding the cost of the tuning services came from the affidavit of its Chief Financial Officer, Blaise Flack. Flack explained that "it took one or two Proper employees a total of approximately 30-40 hours at a cost of approximately $3,000-$10,000 for tuning each of the tools." Flack estimated "that the actual cost to Proper Tooling for tuning the Tools [sic] . . . will range from $25,000 to $35,000 each." Based on Flack's testimony, the total cost to Proper Tooling for tuning Tool 100 and Tool 000 would have been between $50,000 and $70,000. However, given that even Proper Tooling itself argued that the cost would be significantly higher, the court cannot be faulted for declining to rely on this affidavit for its calculation of the cost of the tuning.

The amount the court settled on was $308,731.  The court reasoned that it was "persuaded that Montaplast's calculations more accurately represent the market costs of tuning services, and therefore by extension, are a reasonable approximation of the amount Proper Tooling will save." The $308,731 figure was obtained from an exhibit that Montaplast attached to its May 10, 2022 supplemental brief.  The two-page exhibit listed the work that had been done, the work still needed to be done, and the price for each.  The exhibit was far from perfect as it was not dated and it was not clear how the figures were obtained.  Nevertheless, the trial court found that this was the most credible representation of the costs to perform tuning services, and we will not disturb this finding. See *Luna v Regnier*, 326 Mich App 173, 182-183; 930 NW2d 410 (2018).

Affirmed.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado