**INTERVALE STEEL CORPORATION, formerly Barry Steel Corporation, Plaintiff,**

v.

**BORG & BECK DIVISION, BORG-WARNER CORPORATION, Defendant.**

**Civ. A. No. 81–71079.**

United States District Court, E.D. Michigan, S.D.

Jan. 9, 1984.

Jeffrey G. Heuer, Detroit, Mich., for plaintiff.

Timothy D. Wittlinger, Detroit, Mich., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PHILIP PRATT, District Judge.

This case involves the application of the Uniform Commercial Code, adopted by Michigan, M.C.L.A. § 440.1101 *et seq.*, to the sale of steel by plaintiff to the defendant.[1] The plaintiff, Intervale Steel Corporation (Intervale) is the successor to Barry Steel Corporation (Barry) and sold 22 coils of steel to the defendant Borg & Beck (Borg), a division of Borg-Warner Corporation. The latter has refused to remit the purchase price and this suit ensued.

## I. FACTS

Barry had sold steel to Borg for over 15 years. During most if not all of that period, the defendant's sales representative on the Borg account was Peter Adzema, a metallurgist who was also associated with Barry's quality control department. Adzema visited the Borg plant frequently and was fully aware of Borg's manufacturing processes and procedures. More particularly, Adzema testified he was familiar with Borg's practice regarding the partial fabrication of the parts in question here and the storage of the partially completed parts until customers placed an order, after which the parts would be completed. He was also aware that Borg did not conduct microscopic examinations of ordered steel and did not cut sample pieces from ordered steel and run those samples completely through the fabrication process.

Borg is engaged in the manufacturing or fabrication of parts and components for the automotive industry. In August, 1980, it ordered 98,195 pounds of high carbon cold rolled steel for use in the fabrication of the "Belleville Spring", a component of automobile clutch assemblies. The purchase order set forth the specifications for this steel, which were of critical importance due to the demanding requirements of the "Belleville Spring" and its function in clutch assemblies. The acceptance by plaintiff of the purchase order, of course, resulted in the plaintiff's grant of express and implied warranties of merchantability and fitness for the purpose intended.[2]

Barry obtained the steel originally from Jones and Laughlin Steel in coils. Barry then unrolled the coils, treated the steel, rerolled the coils and on August 26 and 28 of 1980 delivered 22 coils to defendant at the agreed upon price.

Borg, in accordance with its usual practice, checked the steel for dimensional accuracy and chemical content. In August or early September, 1980, Borg began its fabrication process by stamping out "blanks" from strips of the coils and deburring (smoothing) the pieces. It then stored these blanks prior to any further processing pending the receipt of orders from its automotive customers. In late September, Borg removed the pieces from storage and resumed its fabrication process which involved forming by presses, heat treatment, "wheelabrating" (similar to sandblasting), "stroking" (a stress-removal process) and "load-testing" (a quality control measure). During the course of these latter steps, however, it was observed that the springs were cracking and evidencing other failures. Notice was immediately given to Barry and Borg halted production and began extensive testing of the steel. Borg tested for several weeks and communicated to Barry regularly with regard to the testing. Eventually, it was determined that the steel was indeed defective and that the

---

1. Specifically, Article Two of the Code applies since this case involves a transaction in goods. M.C.L.A. § 440.2102 & .2105(1).

2. *See e.g., Fargo Machine & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364 (E.D.Mich. 1977).

cause was associated with the fact that, contrary to the specifications of that type of steel, it had been annealed [3] once, rather than twice.

Barry admitted the steel was defective and not fit for its intended use and conceded the same at trial. Upon discovering that the entire order had been stamped, after providing for some samples for its own testing and demonstrative purposes, Barry authorized Borg to scrap the steel.

The evidence also established that Borg did not conduct metallurgical or microscopic examinations of Barry steel and that Barry was aware of this. It was further established that it is not an industry practice to do so. Moreover, it was also established that "samples" of coil steel are not run through the complete fabrication process due to the high cost of, for example, unrolling the coil, taking samples from representative parts of the coil and tying up the production line for testing purposes.

Intervale, as a successor to Barry,[4] then instituted this suit for $41,612.47, that figure representing the invoice price less credit for the scrap value realized by Borg.[5] It is the position of plaintiff that Borg accepted the steel, is not entitled to revoke that acceptance and is precluded from maintaining an action or asserting the defense of breach of warranty.

## II. ACCEPTANCE AND REVOCATION

Borg argued that it did not "accept" the goods and should not be held obligated to pay the purchase price of the contract. *See* M.C.L.A. § 440.2607(1). Borg reasoned that it properly rejected the goods as required under Sections 2–601, 2–602 and 2–606.[6] According to defendant, although it blanked out all the steel, it could reject the steel because defendant acted reasonably and rejected the goods as soon as the breach of warranty could be discovered. Borg supports this position by citing several cases which have found effective rejections by buyers despite their changing or using the goods. It is true that Borg acted reasonably, nonetheless, under the circumstances Borg's action can only be viewed to constitute acceptance of the steel.

▪▪▪ First, under the Uniform Commercial Code, Borg's rejection after the steel was entirely stamped out was not effective.[7] Borg did not attempt to reject the steel until after it had received shipment, blanked all the steel, and stored the partially completed parts for over a month. In total, Borg retained the steel for over three months before it notified plaintiff of the problems with the steel. The determination of whether goods have been accepted is governed by Section 2–606. That Section states:

(1) Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (sub-section (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is

---

**3.** Annealization is the process of heating and slow cooling in order to toughen the steel and reduce brittleness.

**4.** Barry was actually divided into two separate successor corporations. Intervale was assigned the claim against Borg.

**5.** Plaintiff presumably brings this action pursuant to M.C.L.A. §§ 440.2607(1) & .2709.

**6.** For the sake of brevity and clarity, M.C.L.A. sections will be referred to as the sections are labeled in the Uniform Commercial Code. For

example, M.C.L.A. § 440.2607 will be referred to as 2–607. Citation forms, however, will remain the same.

**7.** A rejection of goods which is wrongful under the Code is deemed ineffective and the items are viewed as accepted. *E.g. Blue Sky Forest Products, Inc. v. New Hampshire Doors Co.,* 63 Or. App. 307, 663 P.2d 813, 36 U.C.C.Rep. 1179 (1983).

wrongful as against the seller it is an acceptance only if ratified by him.
(2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

M.C.L.A. § 440.2606. Subsection (1)(b) appears to most appropriately apply in the instant case[8] and would require that Borg's rejection must be both seasonably given and within a reasonable time pursuant to 2–602.[9]

Borg clearly did not reject the steel within a reasonable time. Not only is three months an over-long period to retain the goods before rejecting them,[10] but Borg's stamping out of all the steel certainly makes its rejection untimely and ineffective.[11] The Code requires that rejection will occur when the goods are tendered and inspected or after the buyer has had a reasonable time for inspection.[12] Timely rejection ensures the goods can be easily restored to the seller so that he can either make them conforming and tender them back to the buyer or simply sell the goods to another. In this way damages will be mitigated and commercial loss curtailed. Rejection is generally not effective after the goods have been manufactured into parts.[13]

 Defendant might argue that it did not have "a reasonable opportunity to inspect" the goods as subsection (1)(b) requires, since the defect could not have been reasonably discovered until the steel was processed into parts. This argument is likewise unavailing. The "reasonable opportunity to inspect" provision is to ensure that a buyer's silence, without more, does not automatically impute acceptance until he has had adequate time[14] to inspect the goods. It does not imply that goods which have been drastically changed and used by the buyer can later be rejected and not viewed as accepted, despite the presence of a latent defect. Buyers who receive nonconforming goods with defects that are not easily detected are provided adequate remedies under the Code even though they

**8.** Plaintiff argues that 2–606(1)(c) applies to the instant case so that Borg's stamping out of the steel is an act inconsistent with the seller's ownership and means acceptance has occurred. A proper reading of 2–606 suggests that subsection (1)(c) should only apply when the buyer acts with knowledge of the defect. Once the buyer discovers the defect and acts inconsistently with the seller's rights, then (1)(c) will deem the buyer to have accepted the goods. *See* M.C.L.A. § 440.2606, comments 3 and 4. In J. White & R. Summers, *Uniform Commercial Code* § 8–2, at 298–99 (2d Ed.1980) the authors correctly state:

> We would argue that acts done in ignorance of the defects which buyer could not have discovered are never covered by 2–606(1)(c). The use of the goods and passage of time might constitute an acceptance under 2–606(1)(a) or 2–606(1)(b). But if *any use* (and all use is theoretically inconsistent with seller's ownership) constitutes an inconsistent act as that term is used in 2–606(1)(c), then there will always be acceptance the minute the buyer uses the goods notwithstanding the fact he has not yet had a "reasonable opportunity to inspect" under 2–606(1)(a) and still has a "reasonable time" to reject under 2–602 (and therefore has not accepted under 2–606(1)(b)). The only reading of 2–606(1)(c) which is consistent with the Code policy and which leaves elbow room for the other provisions of 2–606 is to find that use of goods in ignorance of the defective nature of the goods is not "inconsistent" under 2–606(1)(c).

> (Emphasis supplied.) It should be noted that the *"any use"* language of subsection (1)(c) requires this interpretation in order for the other subsections to have meaning. This does not mean a buyer use, particularly substantial use, could not deem goods as accepted under (1)(a) or (b).

**9.** M.C.L.A. § 440.2602(1) states:
> Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

**10.** *See e.g., Haken v. Scheffler,* 24 Mich.App. 196, 180 N.W.2d 206 (1970); *Jatco, Inc. v. Charter Air Center, Inc.,* 527 F.Supp. 314 (S.D.Ohio 1981).

**11.** *See Trinkle v. Schumacker Co.,* 100 Wis.2d 13, 301 N.W.2d 255, 31 U.C.C.Rep. 39 (1980).

**12.** *See generally* J. White & R. Summers, *supra,* note 8, § 8–2, at 296–318.

**13.** *See, supra,* notes 10–13 & *infra* note 20.

**14.** The standard for "adequate" or "reasonable" time is dependent upon the particular circumstances of each case. M.C.L.A. § 440.1204(2) ("What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.")

have accepted the goods.[15] They do not lose the right to recover damages for the seller's breach of warranty by simply having accepted the goods.

█ This conclusion that Borg's attempt to reject is ineffective is further supported by the relationship the Code establishes between rejection and revocation. The Code provides two methods by which a buyer may act upon nonconforming goods: he may reject them before ever accepting the goods or he may revoke the goods once he has accepted them. The pertinent Code section governing revocation provides:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects.

It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

M.C.L.A. § 440.2608. As the Code suggests, a buyer may more readily reject goods then revoke acceptance since the standard for rejection is more relaxed.[16] A buyer is presented with greater obstacles in order properly to revoke acceptance. For instance, a buyer may reject goods for relatively minor defects.[17] He may not, however, revoke his acceptance unless the "nonconformity substantially impairs" the value of the goods.[18] The difference in standards reflects the degree of prejudice the seller is exposed to in regard to the goods. A buyer's acceptance of the goods will most likely make the seller's ability to cure the nonconformity or resell the goods much more difficult.[19]

Defendant could not avail itself of revocation because a "substantial change in the condition of the goods" was caused by Borg (the steel was stamped into parts) and "not caused by [the goods'] own defect." M.C.L.A. § 440.2608(2).[20] Therefore, it would be a misapplication of the Code to allow defendant's rejection to be effective when it would not be permitted to revoke its acceptance.

---

**15.** Section 2–714 provides that a buyer who accepts nonconforming goods can get damages basically for the reduction in value of the goods due to the nonconformity and any incidental or consequential damages the buyer incurs.

**16.** *See* J. White & R. Summers, *supra,* note 8, at 301.

**17.** *See* M.C.L.A. §§ 440.2601 & .2602.

**18.** *See Colonial Dodge, Inc. v. Miller* (on rehearing) 121 Mich.App. 466, 328 N.W.2d 678 (1982) (purpose of requirement of substantial impairment of value is to preclude revocation for trivial defects or defects which may be easily corrected); *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364 (E.D.Mich. 1977).

**19.** *See* J. White & R. Summers, *supra,* note 8, § 8–3 at 301.

**20.** *See e.g., Trinkle v. Schumacker Co.,* 100 Wis.2d 13, 301 N.W.2d 255, 31 U.C.C.Rep. 39 (1980) (defect in material not discoverable until fabric cut into roman shades, however, revocation ineffective since substantial change in goods occurred); *see also Stroh v. American Recreation & Mobile Home Corp.,* 35 Colo.App. 196, 530 P.2d 989 (1975) (purpose behind not allowing change in goods other than from their own defect is to provide seller opportunity to repair and resell goods); *Republic Corp. v. Procedyne Corp.,* 401 F.Supp. 1061 (S.D.N.Y.1975). The buyer must then turn toward Section 2–714 which provides for the buyer's remedies when he has accepted non-conforming goods. *See Desilets Granite Co. v. Stone Equalizer Corp.,* 133 Vt. 372, 340 A.2d 65, 17 U.C.C.Rep. 769 (1975); *Gawlick v. American Builders Supply, Inc.,* 86 N.M. 77, 519 P.2d 313, 13 U.C.C.Rep. 1031 (1974).

Second, the cases defendant cites in support of its argument that it rightfully rejected the steel are not applicable.[21] In each of those cases the contract expressly provided that rejection could occur even after the buyer had changed or used the material. Of course, parties to a contract are free to determine in their agreement when effective rejection can occur.[22] The instant contract, however, cannot be viewed as modifying the Code provisions in regard to the time of rejection and acceptance. It is true that Adzema, Barry's sales representative who was a metallurgist and associated with Barry's quality control department, was familiar with Borg's fabrication schedule—that Borg did not sample test or examine microscopically the steel, and that it stamped, deburred and stored the steel pending customer orders. It is further true that despite his awareness of those procedures he did not object to them, nor suggest any alternatives or modifications. Yet, it is difficult to conclude that Adzema's knowledge of Borg's procedures can be said to imply that the parties' agreement modified the Code to allow Borg to reject the steel even after it had been stamped into parts. Although defendants do not make this contention, Borg could have more reasonably argued that the 2–608(2) requirement that revocation is not effective if a substantial change in the condition of the goods had occurred was somehow modified by the parties' agreement. But it would be equally difficult to determine that the instant contract intended that modification of the Code also. Thus, Borg's rejection after the steel had been stamped out must be seen as ineffective. Moreover, Borg was likewise not permitted to revoke its acceptance once it had processed all the steel into parts. Defendant is thereby deemed to have accepted and retained the goods.

## II. DEFENDANT'S RIGHT TO SET OFF DAMAGES FROM ITS OBLIGATION TO PAY PURCHASE PRICE

Since defendant accepted the goods under 2–607(2) defendant became obligated for the purchase price of the steel minus the scrap value of the material which was already turned over to the plaintiff.[23] However, since Borg notified Barry Steel of the breach within a reasonable time,[24] defendant may withhold payment of the purchase price to the extent that it has suffered damages from the seller's breach. *See* M.C.L.A. § 440.2717.[25] The Code specifically delineates the damages a buyer is entitled to when he accepts nonconforming goods. Section 2–714 states:

(1) Where the buyer has accepted goods and given notification (subsection (3) of section 2607) he may recover as

**21.** *E.g. Bevel-fold, Inc. v. Bosc Corp.,* 28 U.C.C. Rep. 1333 (Mass.App.1980); *Max Bauer Meat Packer, Inc. v. United States,* 10 U.C.C.Rep. 1056 (Ct.Cl.1972). *See also GNP Commodities, Inc. v. Walsh Heffermen, Co.,* 95 Ill.App.3d 966, 51 Ill. Dec. 245, 420 N.E.2d 659 (1981).

**22.** M.C.L.A. § 440.1102(3) provides that the effect of provisions of the Code can be altered by agreement, except those relating to good faith.

**23.** *See Hellendall Distributors, Inc. v. S.P. Thomas, Inc.,* 559 F.Supp. 573, 36 U.C.C.Rep. 168 (E.D.Pa.1983).

**24.** Plaintiff argues that notice was not within a reasonable time because defendant acted unreasonably in stamping out all of the steel into parts. Presumably, plaintiff views reasonable notice to mean notice after a sample part had been run or a microscopic examination performed which would reveal the defect. However, as the Court has already found, the defendant did not act unreasonably and its notice to

plaintiff when problems in the spring first occurred and when the defect was finally discovered constitutes notice within a reasonable time.

**25.** *See Purofied Down Products Corp. v. Royal Down Products, Inc.,* 87 F.R.D. 685 (W.D.Mich. 1980) (set off under M.C.L.A. § 440.2717 is proper remedy for buyer for seller's breach); *International Computer Group, Inc. v. Data General Corp.,* 159 Ga.App. 169, 283 S.E.2d 12 (1981) (buyer has choice of either withholding damages from purchase price *or* paying the purchase price and counterclaiming damages); *Adam Metal Supply, Inc. v. Electrodex, Inc.,* 386 So.2d 1316, 30 U.C.C. 178 (Fla.App.1980); *McGrady v. Chrysler Motors Corp.,* 46 Ill.App.3d 136, 4 Ill.Dec. 705, 360 N.E.2d 818 (1977); *Creative Gemstones, Inc. v. Union Carbide Corp.,* 47 N.Y.2d 250, 391 N.E.2d 987, 417 N.Y.S.2d 905, 26 U.C.C. 712 (1979) (intent underlying 2–717 to allow deduction for valid counterclaim).

damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

 Although subsection (2) is not the exclusive measure of damages under this section, it would appear that Michigan courts would look first to this normal measure of damages for breach of warranty. *See S.C. Gray, Inc. v. Ford Motor Co.*, 92 Mich.App. 789, 286 N.W.2d 34 (1979). Thus, the defendant is entitled to the difference between the *"value"* of the goods as accepted and their *"value"* had they been as warranted. The evidence at trial established that the value of the steel had it been as warranted was the contract price. No other evidence was offered as to the value of the steel as accepted and the only evidence relating to value was the price obtained in the scrap sale after Borg had processed the steel. Relying upon the case of *S.C. Gray, Inc. v. Ford Motor Co.*, *supra*, plaintiff argues that evidence of only purchase price and salvage price is inadequate to support an award for breach of warranty since it provides no evidence of the actual value of the goods at the time and place of acceptance. Plaintiff would have this Court deem that *S.C. Gray* announced an absolute rule; however, the Michigan court stated that its ruling was based on the circumstances of the case before it.[26] The instant case is significantly different than *S.C. Gray* because of the nature of the nonconforming goods' defects. In *S.C. Gray* the accepted nonconforming goods were machines which had more than scrap value when accepted *and* had appreciable value throughout the period the buyer operated the machines. Moreover, the buyer knew of the nonconformity shortly after acceptance. Although the steel in question had other than scrap value when delivered to the defendant, that value was hidden to any reasonable buyer and the steel became nearly valueless during the buyer's reasonable processing of the material. This difference affects the buyer's measure of damages under the Code.[27]

 Section 2–714 establishes a formula for damages based upon the *"value"* of the goods at their acceptance and if they had been as warranted. The use of the word *"value"* instead of price makes this provision unique in the Code.[28] "Value" is only defined in the Code in 1–201(44), but that definition is not relevant to the present issue.[29] Thus, the question of *"value"* has been largely left for the courts to resolve.

---

**26.** In *S.C. Gray* the court stated:
There was no evidence of the actual value of the equipment at the time of acceptance, although it may well have had some value since there was testimony that the test stands could be easily converted to manual operation and used as backups if automatic stands were being repaired. Evidence of only purchase price and salvage value is inadequate to support an award for breach of warranty under these circumstances. 92 Mich.App. at 806, 286 N.W.2d at 41.

**27.** In their briefs and at trial the parties continually argued as to whether defendant acted reasonably in stamping out all the steel in relation to the acceptance/rejection issue. But the reasonableness of defendant's actions, as will be discussed, is crucial to the question of damages.

**28.** *See* Peters, *Remedies For Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap For Article Two*, 73 Yale L.J. 199, 269 (1963) ("This formula is stated in terms not otherwise employed in the Code, looking to a difference in value, and not in price.").

**29.** M.C.L.A. § 440.1201(44) provides:
"Value". Except as otherwise provided with respect to negotiable instruments and bank collections (sections 3303, 4208 and 4209) a person gives "value" for rights if he acquires them.
(a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is

The *value* of goods "as warranted" has been interpreted to encompass two different standards. The primary standard is the fair market value of the goods at the time of acceptance.[30] In using the fair market value, the courts ensure that the buyer is only recovering his actual damages and does not gain a windfall from a fluctuating market.[31] When the fair market value cannot be easily determined, or the parties do not raise it as a measure of "value", courts have generally relied on the contract's purchase price as strong evidence of the value of the nonconforming goods as warranted.[32] The parties did not present any evidence of the fair market value of the material had it been tendered as warranted. Plaintiff complains of this lack of proof on the part of Borg, however it does not assert nor does it appear that Borg will gain a windfall if the purchase price is used. Further, there was no evidence that the contract price was at all unusual for this high carbon steel. Therefore, the contract's purchase price can properly serve as the *"value"* of the goods had they been as warranted under these circumstances.

A difficulty arises because the Code requires that the *value* of the nonconforming goods (i.e., goods which failed to meet the warranty) be determined as of the time Barry Steel tendered the steel and Borg accepted it. A narrow reading of 2-714(2) would look to the value of the steel if Borg had not processed it and simply attempted to sell the steel on the market. Although the steel was concededly defective and unfit for the buyer's purposes and not of the quality the buyer contracted for, the nonconforming steel could have been used to make a variety of other products. Thus, at the moment defendant accepted the steel it had a value in excess of mere scrap value.[33] Since Borg in acting reasonably could not have discovered the defect in the steel until the steel was blanked out, this objective calculation of the *"value"* of the steel would be unfair and contrary to the purpose of the Code, which is to place the buyer in the same position had the plaintiff rightfully performed. *See* M.C.L.A. § 440.1106.[34] Subsection 2-714(2) does not require this strict interpretation and inequitable result. Rather, subsection (2) qualifies its formula with the phrase "unless special circumstances show proximate damages of a different amount". The effect of the relation of the "special circumstances" clause to the measure of the *"value"* of the goods as accepted has been the subject of considerable discussion.[35] A logical interpretation suggests that the drafters intended "special circumstances" to allow a shifting of

provided for in the event of difficulties in collection; or
(b) as security for or in total or partial satisfaction of a pre-existing claim; or
(c) by accepting delivery pursuant to a preexisting contract for purchase; or
(d) generally, in return for any consideration sufficient to support a simple contract.

**30.** *See* Special Project, *Article Two Warranties in Commercial Transactions,* 64 Cornell L.Rev. 30, 112 (1978) [hereinafter "Special Project"]; *see generally* J. White & R. Summers, *supra* note 8, § 10-2 at 377-81.

**31.** *See generally* Special Project, *supra* note 30, at 112-17.

**32.** *See e.g., Louis DeGidio Oil & Gas Burner Sales & Serv., Inc. v. Ace Eng'r. Co.,* 302 Minn 19, 28-29, 225 N.W.2d 217, 222-23, 15 U.C.C. Rep. 801, 809-10 (1974); *Russo v. Hilltop Lincoln-Mercury, Inc.,* 479 S.W.2d 211, 213, 10 U.C. C.Rep. 768, 770 (Mo.App.1972). *See generally*

Special Project, *supra* note 30, at 112; J. White & R. Summers, *supra* note 8, § 10-2 at 380.

**33.** For example, the steel does appear to have been adequate for the manufacture of 7 inch springs.

**34.** M.C.L.A. § 440.1106 states in pertinent part:
The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act ...

**35.** *See* J. White & R. Summers, *supra* note 8, § 10-3, at 382-83 Special Project, *supra* note 30, at 117-30. *See generally* Priest, *Breach and Remedy For The Tender of Nonconforming Goods Under The Uniform Commercial Code: An Economic Approach,* 91 Harv.L.Rev. 960 (1978).

the time-frame for assessing the perimeters of the 2–714(2) formula.[36] Thus interpreted, the "special circumstances" clause permits this Court to look to some later point to determine the goods' value rather than the time of acceptance. Such "special circumstances" exist in the instant case.

In the course of reasonable conduct, Borg could not and did not find the defect in the steel until all the steel had been stamped out. The steel was substantially worth more than scrap value before Borg stamped it out, but Borg could not have benefited from that value nor could Borg have reasonably known of the material's defective condition until the steel was processed. To measure the *"value"* of the nonconforming goods at the time they were tendered and accepted does not conform with the realities of the parties' transaction.[37] The instant case involves material which was contemplated by the parties to be transformed into parts. This is not the situation before the *S.C. Gray* court where the goods were machines which were intended to fabricate parts. In the latter situation, the nonconformity of the goods was known to the buyer shortly after acceptance when the machines did not perform as warranted. Therefore, it was sensible to measure the *"value"* of the nonconforming goods when accepted and before the buyer made efforts to repair the defect. This case presents a wholly different factual setting, one involving goods and conduct of a significantly different nature. Hence, the proper time to measure the value of the steel was when the nonconformity was reasonably discovered, which was after all the coils had been stamped out. Therefore, the proper measure of damages pursuant to 2–714 is the difference between the price of the steel, representing "the value ... had [it] been as warranted," and the scrap value of the steel after it had been blanked

out into parts, which is the "value of the goods accepted."

In conclusion, defendant is entitled to set off the amount of the purchase price it owes plaintiff with its damages, which is the difference between the scrap value of the steel and the contract price of the material. Thus, plaintiff is not entitled to the $41,612.47 for which it brought this action.

---

**36.** *See,* Special Project, *supra* note 30, at 124–28.

**37.** This is not the normal situation where the buyer accepts the goods with knowledge of their nonconformity or should reasonably have known of the defect. Under those circumstances, the measure of *"value"* is rightly when the goods are tendered and accepted. In the instant case, the realities of the transaction and the reasonable actions of Borg must color the *value* of the defective goods.