**ELECTRICAL POWER SYSTEMS, INC., Plaintiff,**

v.

**ARGO INTERNATIONAL CORPORATION, Defendant.**

**No. 94–C–158–BU.**

United States District Court, N.D. Oklahoma.

Sept. 22, 1994.

R. Richard Love, III, G.W. Turner, III, Conner & Winters, Tulsa, OK, for defendant.

## ORDER

BURRAGE, District Judge.

On August 5, 1994, United States Magistrate Judge Jeffrey S. Wolfe issued a Report and Recommendation with respect to the plaintiff's Motion for Summary Judgment (Docket No. 4). In the Report and Recommendation, Magistrate Judge Wolfe recommended that summary judgment be granted and that the plaintiff be awarded the principal sum of $106,744.00. He also recommended that the plaintiff be awarded monthly interest of $1,601.16, reasonable storage costs since November 27, 1993, the costs of the lawsuit and a reasonable attorney's fee as provided for in 12 O.S. § 936.

This matter now comes before the Court upon the defendant's objection to the Report and Recommendation. The defendant objects to Magistrate Judge Wolfe's recommendation that the plaintiff be granted pre-judgment interest at the rate of 18% per annum and in the amount of $1,601.16 per month. The defendant contends that there is no evidence in the record that the defendant and the plaintiff agreed that interest would accrue on unpaid balances at the rate of 18% per annum.

In response, the plaintiff has submitted a document entitled "Terms of Sale" which states that all past due invoices will be subject to 18% interest per annum. The plaintiff states that it sent the document to the defendant when it acknowledged the defendant's order for the two electrical switchgear assemblies which are the subject of this action.

The defendant, in reply, has submitted the affidavit of its president, John Calicchio. Mr. Calicchio states that he has reviewed the defendant's file relating to this matter and that the invoice sent by the plaintiff does not contain the "Terms of Sale" document.

■ Having conducted a *de novo* review of this matter, the Court agrees with and ADOPTS Magistrate Judge Wolfe's Report and Recommendation to the extent that it

James L. Kincaid, Crowe & Dunlevy, Tulsa, OK, for plaintiff.

recommends judgment be granted in favor of the plaintiff and that the plaintiff be awarded the unpaid contract price of $106,744.00, reasonable storage costs since November 3, 1993, the costs of the lawsuit and a reasonable attorney's fee. The Court, however, disagrees with and REJECTS Magistrate Judge Wolfe's Report and Recommendation to the extent it recommends that the plaintiff be awarded pre-judgment interest at 18% per annum. The Court finds that the plaintiff has failed to present sufficient evidence to establish that the document entitled "Terms of Payment" was actually sent to and received by the defendant. Thus, the Court finds that the plaintiff is only entitled to recover statutory pre-judgment interest, which is currently at 5.69% per annum.

Based upon the foregoing, the Court hereby GRANTS the plaintiff's Motion for Summary Judgment (Docket No. 4). The parties are DIRECTED to submit a proposed judgment for the Court's approval within seven (7) days from the date of this Order. If the parties, after conferring in good faith, cannot agree as to the appropriate amount of storage costs, costs of lawsuit and attorney's fee to be awarded to the plaintiff, the parties shall submit the proposed judgment leaving blanks for the storage costs, costs of suit and attorney's fee. The plaintiff shall file a motion in regard to costs and attorney's fees for the Court's determination.

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

[Filed Aug. 5, 1994]

WOLFE, United States Magistrate Judge.

Now before the Court is Plaintiff's *Motion For Summary Judgment (docket # 4).*[1] The motion comes after Plaintiff Electrical Power Systems, Inc. ("EPSI") sued Defendant Argo International Corporation ("ARGO") to collect a past due account of $106,744. Argo ordered two electrical switchgear assemblies from EPSI and then failed to pay for them.

EPSI, in its *Motion for Summary Judgment,* argues that Argo must pay for the assemblies, citing 12A O.S. § 2–709(1)(b). For the reasons discussed below, the undersigned recommends summary judgment be **granted.**

### I. Facts

The undisputed facts are as follows: Sonotrach needed two electrical switchgear assemblies for use in one of its facilities in Algiers. In 1991, ARGO salesman Michael Burrell, in an effort to purchase the assemblies for Sonotrach,[2] contacted EPSI Production Manager Sue Yates to see if EPSI could submit a quotation for building the assemblies. Westinghouse, apparently similarly interested in soliciting Sonotrach's business, also asked Yates for a quote. EPSI provided quotes to both companies.

On March 8, 1993, ARGO ordered two electrical switchgear assemblies from EPSI for $104,328 plus crating costs. Some seven months later, on October 27, 1993, EPSI completed the specially designed assemblies according to ARGO's specifications. EPSI notified ARGO they were ready to be picked up and sent an invoice for $106,744 (cost plus crating charges). The invoice informed ARGO that payment was due **November 27, 1993.** No payment was ever made, nor were any subsequent agreements entered into between the parties changing the terms of payment.

Sometime between November of 1993 and January of 1994, Yates talked with a Westinghouse representative about the Sonotrach assemblies. Westinghouse asked whether EPSI would "resurrect" the quotation given to Westinghouse by EPSI two years earlier. The Westinghouse representative also told Yates that General Electric Corporation was interested in filling the Sonotrach contract.

Then, on February 8, 1994, John P. Santa-Croce, ARGO's Vice President of International Operations, talked with Yates on the telephone. Yates told SantaCroce that an-

---

1. The motion was referred to the undersigned for a *Report and Recommendation.*

2. Although the record is somewhat unclear, it appears that ARGO planned to purchase the assemblies from EPSI and then re-sell them to Sonotrach.

other company had inquired about the switchgear assemblies. SantaCroce told Yates "that if EPSI had another buyer, that EPSI should sell the equipment to that buyer." *Affidavit of John P. SantaCroce.* A day later, SantaCroce told Bill Cody, Yates' supervisor, the same thing. Yates made no further attempts to sell the assemblies to Westinghouse or General Electric.

After making written demand on ARGO and still receiving no payment, EPSI filed this suit on February 18, 1994. On March 11, 1994, EPSI filed the instant *Motion For Summary Judgment.* Subsequently, after the lawsuit and summary judgment motion was filed, EPSI President Vernon Lawson says that he did telephone representatives of Westinghouse and General Electric to determine if they would purchase the assemblies.[3] Lawson says both companies told him they would not.

## II. Legal Analysis

What is at dispute is (1) whether ARGO "accepted" the assemblies under Section 2–709(1)(a) of the Oklahoma Commercial Code and (2) whether EPSI, under Section 2–709(1)(b) of the Oklahoma Commercial Code, has made a reasonable effort to dispose of the assemblies or show that such an effort would be unavailing. Both questions will be analyzed by the summary judgment procedure outlined in Fed.R.Civ.P. 56.

Summary judgment is proper **"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."**

To determine whether summary judgment should be granted, Rule 56 sets up a two-pronged analysis. First, EPSI, as the moving party, must identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Second, if EPSI meets its burden, ARGO, the non-moving party, must set forth evidence, raising genuine issues of material fact per Rule 56(c). The non-moving party also receives an advantage as the court must accept its evidence as true and must draw all legitimate inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Did ARGO Accept The Assemblies Made By EPSI Under Section 2–709(1)(a)?

At issue here is whether, on summary judgment, EPSI may collect the price of the assemblies from ARGO under 12A O.S. § 2–709(1)(a). The pertinent part of the statute reads: **"When the buyer fails to pay the price as it becomes due, the seller may recover ... the price ... of goods *accepted.*"**

Under Section 2–606(1), acceptance of goods occurs under Oklahoma law when the buyer, after an opportunity to inspect them, relates to the seller that the goods are conforming or that he will take them despite their non-conformity, or where the buyer fails to make an effective rejection, or does any act inconsistent with the seller's ownership. *CMI Corp. v. Leemar Steel Co.,* 733 F.2d 1410, 1414 (10th Cir.1984).

The undisputed facts here are as follows: ARGO ordered custom-made electrical switchgear assemblies from EPSI. These assemblies were tailored specifically to ARGO's specifications. ARGO's plan was to buy the assemblies from EPSI and then sell them to Sonotrach, the "end-user." EPSI manufactured the assemblies. EPSI informed ARGO the assemblies were ready to be picked up on October 27, 1993. Payment was due November 27, 1993. ARGO allowed the November 27, 1993 deadline (when payment was due) to pass and, in effect, did

**3.** Lawson's affidavit also states: "Because the assemblies were specially designed according to ARGO's specifications, the circumstances indicate that it would not be practical for EPSI to resell the assemblies. Because of the special design, the assemblies are of use only to ARGO." *Affidavit of Vernon Lawson.*

nothing. It wasn't until February 8, 1994—more than three months *after* the assemblies were ready for inspection—before ARGO advised EPSI to sell the goods if another buyer was interested.

■ The question is whether ARGO accepted the assemblies. While no mandatory precedent steers the undersigned on this issue, the facts indicate that ARGO "accepted" the assemblies on two grounds. First, ARGO "accepted" the assemblies by not communicating its wishes to EPSI by November 27, 1993. That was the day payment was due, according to the invoice, and ARGO should have "fished or cut bait" by that time. It did neither and, as a result, the undersigned concludes that ARGO accepted the goods; no other agreement having been reached between the parties.

■ Second, ARGO failed to make an effective rejection under Section 2–602(1) of the Oklahoma Commercial Code. That section states: **"Rejection of goods must be *within a reasonable time after their [the seller's] delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."*** By not effectively rejecting the assemblies, ARGO accepted them under 2–709(1)(a).

No bright lines are found in the case law as to what constitutes a "reasonable time" or seasonable notice. The general rule is that a reasonable time for taking any action depends on the nature, purpose and circumstances of such action. *12A O.S. § 1–204(2).* An action is taken "seasonably" when it is "taken at or within the time agreed or if not time is agreed at or within a reasonable time." *12A O.S. § 1–204(3).*

The nature, purpose of circumstances of this case indicate that ARGO did *not* reject within a reasonable time. First, the invoice set the date on which ARGO should have acted—November 27, 1993. That gave ARGO 30 days to inspect the assemblies and reject them if they did not conform. ARGO let the date pass.

Second, although ARGO could argue that it technically did not "agree" to the November 27, 1993 deadline, the Court still finds that the company failed to make an effective

rejection. ARGO waited until February 8, 1994 (more than three months) before talking to EPSI about the assemblies. That notice was faulty for two reasons: it was not seasonable or done within a reasonable time, and, it was ambiguous.

Two cases are persuasive on the issue. The first is *Intervale Steel Corporation v. Borg & Beck Division*, 578 F.Supp. 1081 (E.D.Mich.1984). In that case, Barry Steel (succeeded by Intervale) sold custom-made steel to Borg. Borg tested the steel and eventually alerted Barry that the steel was defective. However, the court concluded that Borg's rejection was ineffective. The court wrote:

> **Borg did not attempt to reject the steel until after it had received shipment, blanked all the steel, and stored the partially completed parts for over a month. In total, Borg retained the steel for over three months before it notified Plaintiff of the problems with the steel.** *Id. at 1085.*

Another case supporting this Court's finding is *CMI Corp. v. Leemar Steel Co., Inc.*, 733 F.2d 1410 (10th Cir.1984). In that case, the seller delivered to the buyer 75 inserts on March 23, 1981. The buyer inspected the goods on March 28, 1981 and found that the inserts were too "thick." However, the buyer did not immediately inform the seller of the problem and, instead, told them of the "problem" in an April 13, 1981 telephone call. CMI then paid for the inserts on April 24, 1981 and subsequently attempted to find someone to "grind down" the inserts. The buyer's efforts were unsuccessful and it then requested that the seller take back the inserts.

The court found that the April 13 telephone call was not a seasonable notification that the buyer was rejecting the goods. **Seasonable notice of rejection,** the court noted, **requires that a buyer give the seller clear and unambiguous notice of his rejection within a reasonable time.** *Explorers Motor Home Corporation v. Aldridge,* 541 S.W.2d 851 (Tex.Civ.App.1976). The court also concluded that, under Oklahoma law, a failure to reject goods results in their acceptance.

The facts in *Intervale* and *CMI, supra,* can arguably be distinguished. The buyers in those cases actually had possession of the goods, tested them and had found problems. Here, unlike the buyers in *Intervale* and *CMI*, ARGO did not have possession of the goods and did not test them. However, product quality is *not* at issue. ARGO had a month to inspect or make *some* comment before the November 27, 1993 invoice deadline and declined. ARGO then waited an additional two months before notifying EPSI in a telephone call "that if EPSI had another buyer, EPSI should sell the equipment to that buyer." As a result, ARGO's delay of three months is similar to the circumstances of a three-month delay in *Intervale, supra.* And the unclear and ambiguous notice (the two telephone calls) is analogous to the *CMI, supra,* case.[4] Two telephone calls months after-the-fact, do not constitute "clear and unambiguous" notice.

Another circumstance facilitating this result is the fact that the goods were specially ordered and designed pursuant to ARGO's specifications.[5] ARGO ordered the assemblies because it planned to sell them to Sonotrach. Those plans, however, misfired. Sonotrach's decision to not complete the transaction apparently saddled ARGO with a potential business loss. In an effort to sidestep the loss, ARGO first did nothing and then attempted a last-second rejection of the assemblies. Such a maneuver, if successful, leaves EPSI—not ARGO—holding the bag (or in this case, the price of the assemblies). The policy behind 2–709 suggests that ARGO should bear responsibilities for its actions.[6]

Finally, ARGO argues that summary judgment is improper because "whether a buyer seasonably notifies the seller of his rejection is a question of fact [and] ... ordinarily a question of fact for determination by a jury." *See Western Conference Resorts v. Pease,* 668 P.2d 973 (Colo.App.1983) and *SPS Industries Inc. v. Atlantic Steel Co.,* 186 Ga. App. 94, 366 S.E.2d 410, 414 (1988). As a general proposition, ARGO's argument is correct. However, in this case, "no genuine issue as to any material fact" exists as to *when and how notice* was given. Therefore, the only interpretation left is a legal one (i.e. did ARGO effectively reject the goods?) Notice was given more than three months *after* the goods were ready and more than two months *after* they were due to be picked up. Thus, the notice was neither seasonable nor done within a reasonable time. In addition, the notice, not done in writing, was ambiguous. Consequently, as a matter of law, ARGO did *not* make an effective rejection.

In sum, the United States Magistrate Judge recommends that summary judgment be granted for EPSI. EPSI should be entitled to recover the unpaid contract price under 2–709(1)(a) ($106,744). In addition, the Magistrate Judge recommends that EPSI be granted monthly interest of $1,601.16, reasonable storage costs since November 27, 1993, the costs of the lawsuit and a reasonable attorney fees as provided for in 12 O.S. § 936, same to be subject of further motion.

Any objections to this Report and Recommendation must be filed with the Clerk of

**4.** 1 White & Summers, *Uniform Commercial Code,* § 8–3 at 407 (3rd ed. 1988) reads: "Although the Code does not expressly rule out oral notice, those who have depended on it non-written notice, or on equivocal notice, have not fared well in courts. *We counsel that notice be written and unequivocal.* See, generally, *Cohen Salvage Corp. v. Eastern Electric Sales,* 205 Pa.Super. 26, 206 A.2d 331 (1965) (Written notice required).

**5.** A second issue raised in EPSI's summary judgment is whether, under Section 2–709(1)(b), EPSI was "unable after reasonable effort to resell them at a reasonable price or [if] the circumstances reasonably indicate that such effort would be unavailing." While material fact questions remain on that issue, the question is mooted by the ruling on EPSI's favor on 2–709(1)(a).

**6.** Another factor not raised by the parties (and, as a result, not a component of this decision) is the "reason" for ARGO's rejection. ARGO does not allege a "non-conformity" with the assemblies. Instead, it simply states that Sonotrach, the "end-user" of the assemblies, would not complete the transaction. That is a "wrongful rejection". In *Intervale,* 578 F.Supp. at 1085, fn. 7, the court found that "a rejection of goods which is wrongful under the Code is deemed ineffective and the items are viewed as accepted." However, an opposite approach was reached in *Blue Sky Forest Products v. New Hampshire Doors,* 63 Or.App. 307, 663 P.2d 813 (1983) where the court found that a wrongful rejection does not constitute an acceptance. However, even in that

Courts within ten (10) days of the receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[7]

Dated this 4th day of Aug., 1994.

---

7. See *Moore v. United States of America,* 950 F.2d 656 (10th Cir.1991).